JANE C. DOWLING *v.* HEIRS OF
NORMAN J. BOND ET AL.
(SC 20665)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The plaintiff landowner sought to quiet title to an abutting parcel of real
property, to which the defendant O Co. held record title. The plaintiff's
shorefront property, which was located on a peninsula protruding into
Long Island Sound, had been owned by the B family for nearly seventy-
five years before the plaintiff purchased it. The deed conveying the
property to the plaintiff identifies the abutting parcel, which is forty
feet wide and bound to the south by Long Island Sound, as a right of
way. O Co., a nonprofit organization formed to promote the interests
of certain property owners on the peninsula, had acquired title to the
parcel and other rights of way to the shoreline in the 1970s. The plaintiff
and her husband, during their plans to expand the house on the property,
began to investigate the property's prior ownership and retained various
attorneys, including M, to research whether the B family had acquired
title to the parcel by adverse possession and to pursue that claim. M
recommended that the plaintiff file a notice of her claim of adverse
possession on the land records pursuant to a provision (§ 47-33f) of the
Marketable Title Act (§ 47-33b et seq.) to ensure that O Co. did not
attempt to extinguish her claim under the act. M also sent a letter
analyzing the factual and legal grounds for and against the claim, in
which M ultimately concluded that the plaintiff had acquired title to the
parcel by adverse possession. Thereafter, the plaintiff recorded a notice
of claim on the land records of the town in which her property and the
parcel were located, claiming a fee interest in the parcel by virtue of
adverse possession. In the present quiet title action, the plaintiff alleged
that her predecessors in title had used and possessed the parcel for
more than fifteen years in an open, visible, notorious, adverse, exclusive,
continuous and uninterrupted manner such that the predecessors in
title, and, through them, the plaintiff, had acquired title to the parcel.
O Co. denied the plaintiff's claim and filed a counterclaim, alleging
slander of title, pursuant to statute (§ 47-33j), on the basis of the plain-
tiff's filing notice of her claim of adverse possession on the land records
and seeking, inter alia, to quiet title in the fee of the parcel in its favor.
During a bench trial, the plaintiff presented evidence of specific uses
of the parcel by the B family that, according to her, supported her claim
of adverse possession, namely, evidence that they had twice repaired
a seawall in front of the parcel, installed a septic system leaching field,
a portion of which was under the parcel, used a parking area on a

Dowling *v.* Heirs of Bond

portion of the parcel adjacent to the property's driveway, and planted
several trees, maintained the lawn and installed a birdbath on the parcel.
After finding that O Co. held record title to the parcel, the trial court
concluded that none of the B family's uses established that they had
repudiated their right by deed to pass over the parcel or placed O Co.
or its predecessors on notice of an adverse possession claim. The court
also found that, although the deed conveying the property to the plaintiff
conveyed an easement over the parcel, the B family did not intend to
convey a fee title to the parcel. The court therefore concluded that
the plaintiff had failed to establish that her predecessors in title had
repudiated their permissive use of the parcel and that, even if proof of
repudiation were not required, the plaintiff had failed to establish her
claim of adverse possession. Accordingly, the court found for O Co. on
both the plaintiff's quiet title claim and the portion of O Co.'s counter-
claim seeking to quite title. The court also found for O Co. on the portion
of its counterclaim alleging slander of title, concluding that the plaintiff
had filed her notice of claim with a reckless disregard for its truth and
for the purpose of slandering O Co.'s fee title to the parcel. On appeal
from the trial court's judgment in favor of O Co., *held*:

1. The trial court improperly required the plaintiff to establish, as a threshold
   matter in proving her claim of adverse possession, that she or her
   predecessors in title had clearly and unequivocally repudiated their right
   by deed to pass over the parcel:

   The repudiation doctrine, which recognizes that, when an original entry
   on land is by permission of the owner or under some right or authority
   derived from the owner, the possession of the land does not become
   hostile until the permission or authority has been clearly repudiated by
   the occupant, did not apply under the circumstances of the present
   case, as the authorities suggested that, when the right to use land for a
   particular purpose is conferred by deed, and the claimant has used the
   land for some other purpose that is more extensive than the right con-
   ferred by the deed, the use may be considered hostile and give rise to
   a claim of adverse possession.

   In the present case, the plaintiff claimed that she or members of the B
   family used the parcel for purposes for which they did not have permis-
   sion, either by license or by deed, and that their use in such a manner
   was sufficiently open, hostile and notorious to give notice to O Co. of
   a claim of adverse possession, and that was all the law required.

2. Notwithstanding the trial court's improper application of the repudiation
   doctrine, that court correctly determined that the plaintiff had failed to
   establish the elements of adverse possession:

   a. The plaintiff could not prevail on her claim that the trial court improp-
   erly had required her to establish, in order to satisfy the element of
   adverse possession that she used the parcel under a claim of right, that

Dowling *v.* Heirs of Bond

she and her predecessors in title had the subjective intent to use the parcel as owners, rather than establishing only that they engaged in acts that objectively evinced such an intent:

This court's cases make clear that the party claiming adverse possession must show his or her intent to use the property as his or her own and that that issue involves an inquiry into that individual's mental condition.

Accordingly, the trial court correctly determined that the plaintiff was required to prove that she and members of the B family subjectively intended to use the parcel as their own in order to establish her claim of adverse possession.

b. The trial court's conclusion that the plaintiff failed to establish the elements of adverse possession was not so inextricably intertwined with its incorrect application of the repudiation doctrine that it could not stand as an independent ground for affirmance, as the evidence in the record supported each of the trial court's findings that formed the basis of its rejection of the uses that, according to the plaintiff, established adverse possession of the parcel:

The B family made no assertion of ownership to the parcel in the various governmental permit applications that they submitted when repairing the seawall, and they shared the expense of those repairs with neighbors, indicating that they were not acting under a claim of ownership.

The limited evidence regarding the septic system, including a memorandum from O Co. stating that its members could install septic systems in the rights of way, suggested a permissive use, and the septic system was underground and, thus, was not a visible or notorious use of the parcel.

The evidence demonstrated that the members of the B family were aware that they did not own the parcel and understood that O Co. could remove the trees they had planted on the parcel if the trees interfered with the right of way, the B family used the gravel parking area that encroached on the parcel only when they hosted large gatherings, which was not inconsistent with O Co.'s use of the parcel or the manner in which other owners of property abutting the rights of way leading to the shoreline used the rights of way, and the birdbath that was installed on the parcel, which was only thirty-six inches in diameter, was not a substantial structure that could give rise to a claim of adverse possession of the entire parcel.

Historical evidence showed that the heirs of the individual who originally subdivided the properties on the peninsula and O Co.'s predecessor had expressed an intent to maintain the rights of way for the benefit of the community of property owners in the development, and the trial court found no evidence that members of the B family had acted in a way that was inconsistent with their easement over the parcel, that their conduct

with respect to the parcel was dissimilar to the conduct of other shore-front lot owners with respect to rights of way abutting their properties, or that they had acted in a way inconsistent with the prevailing community spirit on the peninsula, such that their activities did not evince an intent to use the property as their own.

Accordingly, although the plaintiff was not required to establish that her predecessors in title had repudiated their right by deed to pass over the parcel in order to establish adverse possession, she was required to establish that any more extensive use of the parcel was not impliedly permitted, which she failed to do, and the trial court's legal error regarding the repudiation doctrine could not have impacted its conclusion that the plaintiff had failed to establish adverse possession.

3. O Co. failed to demonstrate, as a matter of law, that the plaintiff had acted with malice when she filed notice of her claim of adverse possession on the land records, the trial court therefore incorrectly determined that she slandered O Co.'s title, and, accordingly, this court reversed in part the trial court's judgment and remanded the case with direction to render judgment for the plaintiff on that portion of O Co.'s counterclaim alleging slander of title under § 47-33j:

The plaintiff's notice of claim was premised on an incorrect legal theory that had been endorsed by her attorneys, namely, that she could establish adverse possession by showing that she and her predecessors in title had used the parcel in a manner that objectively evinced their intent to own it, regardless of their subjective beliefs regarding actual ownership, and, although M and the plaintiff's other attorneys were incorrect regarding that legal proposition, the malice necessary for slander of title does not exist when the offending party's actions rest on a rational but incorrect interpretation of the law.

In the present case, the fact that the plaintiff's attorneys were incorrect with respect to their interpretation of the law did not mean that their position was so irrational that no reasonable attorney could propound it, as they relied on this court's own case law, albeit case law that has since been overruled, and a number of other jurisdictions employ the rule urged by the plaintiff's attorneys.

Accordingly, although the plaintiff's claim of adverse possession was weak, both factually and legally, the claim was at least colorable in light of her mistaken but not entirely unreasonable position that she was not required to establish that her predecessors in title had any subjective intent to use the land as their own.

Although evidence of a bad or corrupt motive or an intent to inflict harm is not required to establish a claim of slander of title under § 47-33j, lack of such a motive or intent may be probative, and, in the present case, the plaintiff had nothing to gain by recording a notice of a knowingly

Dowling *v.* Heirs of Bond

false claim, and her sole motive in recording the notice was to prevent her adverse possession claim from being extinguished by operation of the Marketable Title Act.

Insofar as this court determined that O Co. could not prevail on its slander of title claim under § 47-33j, O Co. was not entitled to attorney's fees and costs pursuant to that statute, and, accordingly, this court vacated the trial court's award of attorney's fees and costs.

Argued March 30—officially released October 18, 2022

*Procedural History*

Action for a declaratory judgment to determine the rights of the parties to a certain parcel of real property, brought to the Superior Court in the judicial district of New London, where the defendant The Old Black Point Association, Inc., filed a counterclaim; thereafter, the court granted the motion to bifurcate the issues of liability and damages filed by the defendant The Old Black Point Association, Inc.; subsequently, the case was tried to the court, *Hon. Emmet L. Cosgrove*, judge trial referee; judgment for the defendant The Old Black Point Association, Inc., on the complaint and the counterclaim; thereafter, the court, *Hon. Emmet L. Cosgrove*, judge trial referee, granted the motion for costs filed by the defendant The Old Black Point Association, Inc., and the plaintiff appealed. *Reversed in part*; *vacated in part*; *judgment directed*.

*Wesley W. Horton*, with whom were *Louis B. Blumenfeld* and, on the brief, *Brendon P. Levesque* and *Lorinda S. Coon*, for the appellant (plaintiff).

*Timothy D. Bleasdale*, with whom were *Edward B. O'Connell* and *Tracy M. Collins*, for the appellee (defendant The Old Black Point Association, Inc.).

*Opinion*

ECKER, J. This appeal arises from a dispute over the ownership of a parcel of land that abuts property owned by the plaintiff, Jane C. Dowling, and to which the

Dowling *v.* Heirs of Bond

defendant The Old Black Point Association, Inc.,[1] holds record title. The plaintiff brought this quiet title action against the defendant, contending that her predecessors in title had acquired fee ownership of the disputed parcel by adverse possession. The defendant filed a counterclaim, alleging, among other things, that the plaintiff had slandered its title to the parcel under General Statutes § 47-33j by filing a notice of her claim of adverse possession on the land records. Following a bench trial, the trial court concluded that the plaintiff had failed to establish her claim of adverse possession and that the defendant had prevailed on its counterclaim and rendered judgment accordingly. After a subsequent hearing in damages, the trial court awarded $338,542.50 in attorney's fees and $44,876.33 in costs to the defendant. This appeal followed.[2]

We conclude that the trial court correctly determined that the plaintiff had failed to establish ownership of the parcel by adverse possession but that it incorrectly determined that the defendant had established its counterclaim for slander of title. Accordingly, we affirm the judgment in favor of the defendant on the plaintiff's quiet title action and reverse the judgment in favor of the defendant on its counterclaim for slander of title.

The following facts were found by the trial court or are undisputed. In 2006, the plaintiff purchased property located at 287 Old Black Point Road in East Lyme (property) from John M. Bradley, Scott Bradley and Anne Bradley Davis (collectively, Bradley siblings) for $2.6

---

[1] The complaint also named as defendants the heirs of Norman J. Bond and "all unknown persons, claiming or who may claim any rights, title, interest or estate in or lien or encumbrance [on] the real property described in this complaint, adverse to the plaintiff, whether such claim be vested or contingent." Those defendants are nonappearing, and all references to the defendant in this opinion are to The Old Black Point Association, Inc.

[2] The plaintiff appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

Dowling *v.* Heirs of Bond

million. The deed to the property, which is located on a peninsula protruding into Long Island Sound known as Old Black Point, indicates that it is bounded on the north by Avenue A, on the east by "a [right of way forty] feet wide," on the south by Long Island Sound and on the west by "land now or formerly of Annette Hills Olds . . . ."

The defendant is a nonprofit organization formed "[t]o promote social, recreational, cultural and athletic activities of owners and occupants of property in Old Black Point . . . ." During negotiations for the sale of the property by the Bradley siblings to the plaintiff, representatives of the defendant met with the plaintiff's son, Vincent Dowling, Jr. (Dowling Jr.), to discuss the forty foot right of way that forms the easterly boundary of the property (parcel).[3] The defendant's representatives advised Dowling Jr. that the defendant had acquired title to the parcel in the 1970s, along with other rights of way running from Avenue A to the shoreline, several of which ran through a seventy-five foot right of way or "reservation" running along the shoreline.[4] The defendant was interested in enforcing a parking ban on all of the rights of way and, to this end, wanted Dowling Jr. to reconfigure a gravel parking area for the property that encroached on the parcel. The defendant and Dowling Jr. also had a discussion about removing some trees that had been planted along the northern

---

[3] Dowling Jr. had originally entered into the contract to purchase the property, but he assigned the contract to the plaintiff after he decided to purchase another property abutting the easterly boundary of the parcel.

[4] The warranty deed conveying the property to the plaintiff provided that the property includes a strip of land, approximately seventy-five feet wide, north of Long Island Sound and bounded by extensions of the eastern and western boundaries of the property, on condition that the strip "shall not be built upon." (Internal quotation marks omitted.) Other shoreline properties similarly extend into the reservation. The parcel and many of the other rights of way running from Avenue A to the reservation along the shoreline are covered in grass and are visually indistinguishable from the lawns of the properties that they run between, as is the reservation along the shoreline.

Dowling *v.* Heirs of Bond

boundary of the parcel and who would be responsible for maintaining the parcel, including the portion of a seawall that runs along the parcel's southern boundary.[5] Dowling Jr. informed Scott Bradley of the substance of the meeting and requested that the Bradley siblings reduce the price of the property to cover any costs associated with the reconfiguration of the driveway.

On January 16, 2006, Scott Bradley sent an email to the defendant's board of governors asking the defendant to "consider less drastic measures" than those discussed with Dowling Jr.[6] He pointed out that the Bradley family had owned the property for almost seventy-five years and had always used a portion of the parcel for parking; that, in 1998, it had split the cost to repair the portion of seawall abutting the parcel with the owner of the adjoining property; and that the trees had been on the parcel for thirty years. Scott Bradley suggested that, in light of his family's historic use of the parcel, the doctrine of adverse possession might present "legal issues . . . not favorable to the approach [that the defendant] is currently pursuing."

The Bradley siblings ultimately agreed to reduce the purchase price of the property by $68,000 "in lieu of resolving the issues relating to . . . [the location of] the driveway and the [condition of the] seawall . . . ." In a "comprehensive title affidavit" provided to the plaintiff at the closing, the Bradley siblings' representative by power of attorney asserted that "a portion of a gravel drive and parking area [located on the property] . . . encroaches onto a right of way owned by another." The property was conveyed to the plaintiff by a war-

---

[5] The seawall runs along the southern shoreline of Old Black Point, including the shoreline forming the southern boundary of the plaintiff's property, with its easterly end near the parcel's eastern boundary.

[6] Scott Bradley indicated in a subsequent email to certain members of the board that he had provided a copy of the January 16, 2006 email to "VJ," or Dowling Jr.

Dowling *v.* Heirs of Bond

ranty deed that was recorded in the East Lyme land records on March 24, 2006.

Thereafter, the plaintiff and her husband, Vincent Dowling, Sr. (Dowling Sr.), made plans to renovate and expand the house on the property. Their architect informed them that they could not expand the house in an easterly direction because of its close proximity to the parcel's western boundary.

After searching the East Lyme land records, probate records, and other records pertaining to the ownership of the property, Dowling Sr., who is a retired attorney, sent an email to Dowling Jr. on January 8, 2007, stating that there was "no basis for the assertion that the [defendant] has a legal interest in the [parcel]." Rather, Dowling Sr. believed that the activities of the plaintiff's predecessors in title over the preceding seventy-five years had resulted in the acquisition of title by adverse possession. Those activities included (1) the restoration of the portion of the seawall abutting the parcel after the 1938 hurricane, (2) the installation of the driveway and parking area that encroached on the parcel, (3) the installation of a birdbath on the parcel, (4) the installation of a septic system, part of which was located under the parcel, (5) the planting of trees across a portion of the parcel's northern boundary, and (6) the mowing and maintenance of the parcel.

Apparently, after conducting additional research, Dowling Sr. learned that attorney Robert W. Marrion had conveyed certain ownership interests in the rights of way on Old Black Point to the defendant by way of a deed dated December 22, 1977. On February 8, 2007, Dowling Sr. sent Dowling Jr. an email stating that, for a variety of reasons, the defendant's position that it owned the parcel by virtue of this deed "border[ed] on the ludicrous."[7]

---

[7] Specifically, Dowling Sr. believed that the eleven deeds transferring the interests in the rights of way from the heirs of the landowner who had originally subdivided the property, Norman J. Bond, to Marrion—which

Dowling *v.* Heirs of Bond

In February, 2007, Dowling Sr. retained Attorney Clifford J. Grandjean to investigate whether the plaintiff's predecessors in title had acquired title to the property by adverse possession. After researching the issue, on June 6, 2007, Grandjean sent a letter to the defendant indicating that he was "aware of a flurry of [quitclaim] deeds involving rights of way in the mid-1970s" from the former record title owners to Marrion. Grandjean indicated that he did not believe that these quitclaim deeds established the defendant's ownership of the parcel because, among other reasons, title to the parcel had passed to the plaintiff's predecessors in title long before the quitclaim deeds were recorded. Grandjean also asked the defendant "to desist from any entry upon the [parcel] without specific permission of [the plaintiff]" and indicated that "to do so without permission will constitute an act of trespass."

On September 14, 2007, Grandjean sent a letter to Dowling Sr. regarding a meeting that he had had with the defendant's attorney, Granville Morris. Grandjean indicated that Morris had provided a packet containing some of the defendant's meeting minutes and correspondence referring to the parcel. The packet included what Grandjean characterized as "some troubling correspondence signed by both Stephen Bradley and Anne Bradley in the early 1970s regarding trees they erected

were the interests that Marrion subsequently transferred to the defendant— could not have included the interests of all of the heirs. Dowling Sr. also referred in his email to a memorandum dated March 1, 1982, from Frank W. Hubby III, to representatives of the defendant, in which Hubby described the history of the ownership of the Old Black Point rights of way and indicated that the defendant now owned some of them, including the parcel. Dowling Sr. believed that Hubby's analysis was flawed because the 1886 deeds conveying the waterfront properties referred to a map dated 1886, whereas the various deeds conveying interests in the rights of way that Hubby referred to contained references to another map filed on the East Lyme land records in 1915. The trial court ultimately concluded that the 1886 map and the 1915 map were substantially identical for purposes of this litigation.

on the [parcel].''[8] It also included minutes showing that
Anne Bradley, who had been on the defendant's board
of governors, had participated in discussions regarding
the rights of way in the 1970s.

Several months later, Grandjean wrote another letter
to Dowling Sr., inquiring whether he should commence
litigation over the ownership of the parcel. He indicated
that he would be willing to do so if Dowling Sr. had ''a
realistic view of the factual 'warts' [that] exist in the
case . . . .'' In response to a request by Dowling Sr.
that he identify the ''potential stumbling blocks'' to a
successful resolution of the dispute over ownership of
the parcel, Grandjean sent another letter indicating that
he had concerns about whether the ''adverse'' element
of adverse possession could be established when it
was clear that, at the time that the land was initially
subdivided in 1886, ''the original landowner intended
to convey, in perpetuity, a limited right to the [parcel]
to [the plaintiff's] predecessor in title.'' Grandjean was
also concerned that the court would impute knowledge
of the defendant's ownership of the parcel to Anne
Bradley as the result of her membership in the defen-
dant's board of governors in the 1970s, when the defen-
dant was acquiring title to the rights of way. Grandjean
further stated that the Bradley siblings had indicated
''that they knew the strip [containing the right of way]
was there—they just thought it was far narrower than
it turned out to be.''

On January 19, 2009, Eunice Groark, the president
of the defendant's board of governors, wrote a letter
to the plaintiff and Dowling Sr. on behalf of the defen-
dant, in which she reported the results of the defen-
dant's investigation into the ownership of the parcel.

---

[8] Stephen Bradley and Anne Bradley were the parents of the Bradley
siblings and were their predecessors in title to the property. See footnote
16 of this opinion.

Dowling *v.* Heirs of Bond

Groark indicated that the plaintiff's property had origi-
nally been part of a farm owned by Norman J. Bond
that was subdivided in 1886. She further indicated that
the deed conveying the newly created property, as well
as an adjoining property, to a "Mr. How"[9] indicated that
there was a forty foot right of way running along its
easterly boundary, and there was no evidence that own-
ership of the right of way had been conveyed to How.
All ownership rights, including ownership of various
rights of way, that were retained by Bond passed to his
heirs at his death and were acquired by the defendant
in the 1970s. The right of way at issue had been shown
on town maps as an avenue or road for more than 100
years. Groark also indicated that Scott Bradley had
informed her that the Bradley family had always real-
ized that the parcel did not belong to them and that
they had not maintained the parcel under a claim of
ownership. Rather, the Bradleys had repaired the por-
tion of the seawall between the parcel and Long Island
Sound in order to protect their own property and had
mowed the parcel because that was the common prac-
tice among the owners of properties abutting the vari-
ous rights of way.

Thereafter, the plaintiff retained Attorney Dwight H.
Merriam of the law firm of Robinson & Cole, LLP, to
pursue her claim to ownership of the parcel. In turn,
Merriam retained Attorney Richard S. Johnson to con-
duct a title search of the parcel. On December 2, 2010,
Merriam provided Dowling Sr. with a draft memoran-
dum indicating that there was a "risk" that the defen-
dant would rely on the Marketable Title Act (MTA),
General Statutes § 47-33b et seq.,[10] to invalidate the

_____

[9] Groark referred to a "Mr. Howe," and that spelling is occasionally used
throughout the record. The typed transcript of the handwritten 1886 deed
conveying the property from Bond's estate indicates that it was conveyed
to "Daniel R. How," and we use that spelling for purposes of this opinion.

[10] General Statutes § 47-33c provides: "Any person having the legal capacity
to own land in this state, who has an unbroken chain of title to any interest
in land for forty years or more, shall be deemed to have a marketable record

Dowling *v.* Heirs of Bond

plaintiff's claim of adverse possession and recommending that, pursuant to General Statutes § 47-33f,[11] the plaintiff file a notice of her claim of adverse possession on the land records "during or prior to 2016" to ensure that the claim was not extinguished. (Emphasis omitted.) On August 9, 2011, Merriam wrote a ten page, single spaced letter addressed to the plaintiff, in which he analyzed the factual and legal grounds for and against a claim of adverse possession, and concluded that title to the parcel had passed to the plaintiff by adverse possession. The letter closed by inquiring whether the plaintiff wanted to commence a quiet title action. In a separate email to Dowling Sr., Merriam indicated that the letter was "not an opinion letter" but "a forceful statement of [the plaintiff's] best case . . . ."[12] On December 23, 2015, the plaintiff filed a notice of claim pursuant to General Statutes § 47-33f on the East Lyme land records, in which she claimed a fee interest in

title to that interest, subject only to the matters stated in section 47-33d. A person has such an unbroken chain of title when the land records of the town in which the land is located disclose a conveyance or other title transaction, of record not less than forty years at the time the marketability is to be determined, which conveyance or other title transaction purports to create such interest in land, or which contains language sufficient to transfer the interest, either in (1) the person claiming that interest, or (2) some other person from whom, by one or more conveyances or other title transactions of record, the purported interest has become vested in the person claiming the interest; with nothing appearing of record, in either case, purporting to divest the claimant of the purported interest."

[11] General Statutes § 47-33f (a) provides in relevant part: "Any person claiming an interest of any kind in land may preserve and keep effective that interest by recording, during the forty-year period immediately following the effective date of the root of title of the person whose record title would otherwise be marketable, a notice in writing, duly verified by oath, setting forth the nature of the claim. . . ."

[12] The trial court ultimately found that Merriam's legal conclusions and advice to the plaintiff were based on incomplete information because the plaintiff had failed to provide Merriam with the title affidavit, closing documents or Grandjean's letter outlining the "warts" in her claim of adverse possession. (Internal quotation marks omitted.) We discuss this issue in part III of this opinion.

Dowling *v.* Heirs of Bond

the parcel "by virtue of adverse possession in favor of her predecessors."

Thereafter, the plaintiff brought this quiet title action, alleging in the operative complaint that her predecessors in title had used and possessed the parcel for more than fifteen years in an open, visible, notorious, adverse, exclusive, continuous and uninterrupted manner such that the predecessors in title, and through them, the plaintiff, had acquired title to the parcel. The defendant denied the plaintiff's claim and raised the following special defenses: (1) the parcel is a right of way shared in common with others, and, therefore, the plaintiff's use of the property was not exclusive; (2) even if the plaintiff and her predecessors adversely possessed the parcel, title to the parcel was extinguished by the defendant's adverse possession of the parcel for more than fifteen years following the period of adverse possession claimed by the plaintiff; (3) the plaintiff's use of the parcel was permissive; (4) if the plaintiff's predecessors acquired title by adverse possession, her title was extinguished pursuant to the MTA because her interest was not asserted within forty years following the recording of the deeds from Bond's heirs to Marrion conveying their interest in the parcel; and (5) any interest of the plaintiff's predecessors in the parcel was extinguished because it was an unrecorded interest predating the effective date of the MTA and was not recorded on the land records during the statutory two year grace period between July 1, 1969, and July 1, 1971. In addition, the defendant filed a counterclaim, asserting that (1) the defendant had acquired marketable record title to the parcel under the MTA, and (2) the plaintiff committed the statutory tort of slander of title under § 47-33j[13]

_____

[13] General Statutes § 47-33j provides: "No person may use the privilege of recording notices under sections 47-33f and 47-33g for the purpose of slandering the title to land. In any action brought for the purpose of quieting title to land, if the court finds that any person has recorded a claim for that purpose only, the court shall award the plaintiff all the costs of the action, including such attorneys' fees as the court may allow to the plaintiff, and

Dowling *v.* Heirs of Bond

when she filed her notice of claim pursuant to § 47-33f because she "knew or should have known" that her predecessors in title to the parcel lacked the requisite intent to convey an adverse possessory interest in the parcel to her. The defendant sought a judgment declaring that the plaintiff's notice of claim was null and void and without legal effect, a decree that the defendant has marketable title to the parcel under § 47-33b, and attorney's fees and costs pursuant to § 47-33f.

The case was tried to the court. In its memorandum of decision, the trial court noted that, contrary to the plaintiff's suggestion in some of the correspondence preceding the quiet title action, she was not claiming that she had title to the parcel free and clear of the rights of other property owners in Old Black Point to pass across it but, rather, was claiming only that she possessed a fee title to the parcel subject to those rights. The court then found that the evidence presented at trial established that the parcel was first identified on a map of the Bond estate recorded in the East Lyme land records in 1886. That map showed twenty-five lots bordering on a seventy-five foot "avenue" running along Long Island Sound, as well as other rights of way located between several of the lots and accessing the avenue. A map filed on the land records in 1915 also showed the seventy-five foot strip, now designated a "reservation," and the rights of way. The court also found that all owners of the lots shown on the maps were entitled to use the rights of way and the seventy-five foot reservation to access the shoreline and concluded that the 1886 and 1915 maps created a common scheme of development.[14]

in addition, shall decree that the defendant asserting the claim shall pay to the plaintiff all damages the plaintiff may have sustained as the result of such notice of claim having been so recorded.''

[14] "When making a finding as a matter of law that a common development scheme exists, courts look to four factors: (1) the common grantor's intent to sell all of the subdivided plots; (2) the existence of a map of the subdivision; (3) actual development of the subdivision in accordance with the general

Dowling *v.* Heirs of Bond

With respect to the issue of whether the defendant had record title to the parcel, the court concluded that the parcel was not included in the 1886 deed transferring the property from Bond's estate to How but that the deed granted an easement over the parcel, the boundaries of which were marked by merestones. The court further found that, "[b]y virtue of a distribution from [Bond's] estate . . . in 1926, the fee title to the rights of way . . . [on] Old Black Point, including the parcel, was to the eight heirs of . . . Bond." In the mid-1970s, Marrion, acting as trustee for the defendant, contacted the Bond heirs and secured quitclaim deeds conveying their interests in the rights of way to him, as trustee. Eleven deeds were recorded on November 21, 1975, and the twelfth and final deed was recorded in January, 1976. The trial court found that Marrion had obtained quitclaim deeds from all of Bond's heirs. On December 23, 1977, Marrion conveyed his interest in the fee title to the rights of way, including the parcel, to the defendant by quitclaim deed. Accordingly, the trial court concluded that the defendant held record title to the parcel.

The trial court then addressed each of the specific uses of the property that, according to the plaintiff, supported her claim of adverse possession, beginning with the plaintiff's claim regarding the repair of the portion of the seawall adjacent to the parcel after the 1938 hurricane.[15] The court noted that, shortly after the

scheme; and (4) substantially uniform restrictions contained in the deeds of the subdivided plots." *DaSilva* v. *Barone*, 83 Conn. App. 365, 373, 849 A.2d 902, cert. denied, 271 Conn. 908, 859 A.2d 560 (2004).

[15] Much of the trial court's discussion of the specific facts regarding each aspect of the plaintiff's claim took place in the context of the court's consideration of the defendant's argument that the plaintiff's uses of the parcel did not give rise to adverse possession because the plaintiff and her predecessors in title had permission to use the parcel, and they had never repudiated the prior permissive use. As we discuss more fully in part I of this opinion, when a claimant's initial possession of the property for a particular purpose is permissive, the possession does not become hostile until the permission or authority has been clearly repudiated.

Dowling *v.* Heirs of Bond

hurricane, the board of directors of the defendant's predecessor association had written a letter to its members, property owners at Old Black Point, describing how the hurricane had destroyed ten to thirty feet of the seventy-five foot reservation in front of the shorefront properties. The letter indicated that the owners of the shorefront properties were working together to build a seawall and to rebuild the lawn "at individual expense." The letter also indicated that this was being done to "protect the property and [to] preserve the beauty of [Old Black] Point—and consequently will inure to the benefit of all." The trial court found that Mary Tremaine Bradley[16] and the owner of the neighboring property to the west—which did not abut the parcel—shared the cost of repairing or replacing the seawall in front of their respective properties and in front of the parcel. In addition, the trial court found that continuing the seawall in front of the parcel was necessary to protect Mary Tremaine Bradley's property.

With respect to the evidence that Stephen Bradley and Anne Bradley had repaired the seawall in front of the parcel in the late 1990s, the trial court noted that the engineer who was handling the application to perform the repairs asked Anne Bradley who owned the parcel, but there was no evidence of any response. On March 11, 1997, the engineer wrote to the defendant indicating that the Bradleys had applied to various government entities for permission to repair the seawall, including the portion abutting the parcel. He further indicated that the ownership of the parcel was unclear but that either the town of East Lyme or the defendant was the "most probable owner," and he requested that

---

[16] Mary Tremaine Bradley owned the property from 1927 to 1946. In 1946, she transferred the property to her nephew, Stephen Bradley. In 1971, Stephen Bradley transferred title to himself and his wife, Anne Bradley in survivorship. In 1994, Anne Bradley transferred title to an irrevocable trust for the benefit of her children, the Bradley siblings.

the defendant provide a "letter of endorsement" for the proposed project. A copy of the engineer's letter was sent to the Bradleys. On March 16, 1997, the defendant provided the requested endorsement in writing. The trial court found that the cost of this repair in front of the parcel was shared by the Bradleys and the owners of the shoreline property abutting the Bradleys' property to the west.

The trial court concluded that the plaintiff had failed to establish by clear and convincing evidence that the repairs to the seawall in 1938 and the 1990s put the Bond heirs or the defendant "on notice of a repudiation of their ownership of the fee [to the parcel] or that an adverse possession claim was initiated or continuing." In addition, the court concluded that, because all of the shorefront property owners had repaired the portions of the seawall located on the rights of way abutting their respective properties after the 1938 hurricane, and because the cost of constructing and repairing the seawall adjacent to the parcel had been shared by the plaintiff's predecessors in title and their neighbors in both 1938 and the 1990s, the evidence did not establish that the plaintiff's predecessors in title had asserted a claim of ownership over the parcel.

The court then addressed the plaintiff's claim that the installation of a septic system leaching field by her predecessors in title supported her claim of adverse possession to the parcel. The court found that a portion of the existing septic system for the plaintiff's property lies partly under the parcel. The court then noted that the defendant had sent a memorandum to all of its members in 1964 addressing the sanitation "situation" on Old Black Point. The memorandum stated that septic systems could be installed in the rights of way between the various properties, including the right of way abutting the Bradley property. The trial court indicated that this authorization suggested a permissive use. The court

Dowling *v.* Heirs of Bond

also referred to the evidence showing that Stephen
Bradley and Anne Bradley submitted an application
to the East Lyme Department of Health for a sewage
disposal system in July, 1971. The court ultimately con-
cluded that, because the circumstances surrounding
the installation of the septic system and when it was
installed were unclear, the existence of the septic sys-
tem did not support the plaintiff's claim of adverse
possession. The court further noted that, because the
septic system was underground, it was not a visible or
notorious use of the property for purposes of adverse
possession. Accordingly, the court concluded that the
evidence relating to the septic system did not constitute
"clear and convincing evidence of repudiation or adverse
possession."

The court also rejected the plaintiff's claim that the
fact that Stephen Bradley and Anne Bradley had planted
several evergreen trees or shrubs across a portion of
the entrance to the parcel in 1971 supported their claim
of adverse possession. The evidence showed that the
defendant initially had objected to the plantings. The
Bradleys responded by stating that their "sole intent in
planting the shrubs was to establish some means of
controlling the proper use of the [right of way] and
at the same time [to] have the area look reasonably
attractive," and offered to make a gift of the plants to
the defendant so that it could remove them when it
chose. The defendant declined this offer because nei-
ther the Bradleys nor the defendant owned the parcel
at the time.[17] Ultimately, the defendant's board of gover-
nors decided by vote that it would allow the plants to
remain but would remove them "at any time in the
future when they interfere with the [right of way]."
Stephen Bradley was present at the meeting when this

_____

[17] As we explained, Bond's heirs owned the parcel at the time, and the
defendant did not obtain title until several years after this exchange of corre-
spondence.

Dowling *v.* Heirs of Bond

vote was taken. The trial court concluded that this evidence did not support a finding "of a repudiation by the Bradleys of the Bond ownership of the parcel" or that the planting of the trees was "an open, adverse, notorious use under a claim of right by the Bradleys to assert that they owned the fee to the parcel . . . ."

With respect to the plaintiff's claim pertaining to the Bradley family's use of a gravel parking area on the parcel adjacent to the property's driveway, the trial court found that the evidence showed that the Bradleys had not used the area for parking on a daily basis, but only when there were larger family gatherings, and that other property owners in Old Black Point likewise used the rights of way adjacent to their lots for similar purposes. The court also noted that, in exchange for a reduction in the purchase price of $68,000, the plaintiff had agreed to reconfigure her driveway and parking area so that the parking area was located on her property and the driveway was located on the parcel, consistent with her right to pass and repass. The court concluded that this use did "not provide clear, positive, and unequivocal evidence of repudiation or of adverse possession."

Finally, the trial court addressed the plaintiff's claim pertaining to the maintenance of the lawn on the parcel and the installation of a birdbath. The court concluded that, prior to 2006, the shorefront property owners had retained one or two landscaping contractors to mow the entire lawn in front of the properties, including the rights of way and the seventy-five foot reservation running along the shoreline. The court further concluded that there was limited evidence as to how the property owners shared the expense of maintaining the lawn but that the plaintiff was aware that the landscaping contractors were unwilling to allocate the cost of mowing the rights of way, including the parcel. Regarding the birdbath, the court found that it was a small

Dowling *v.* Heirs of Bond

structure, approximately thirty-six inches in diameter at its largest, and that there was no evidence of who installed it or when. The court concluded that the evidence pertaining to lawn maintenance and the installation of the birdbath was not clear and convincing evidence of "repudiation of the easement rights" or adverse possession.

The trial court next considered whether the Bradley siblings had intended to convey title to the parcel when they sold the property to the plaintiff. The court found that the deed conveying the property to the plaintiff expressly provided that it conveyed an easement over the parcel and that the property did not include title to the fee.[18] In addition, the title affidavit provided by the Bradleys' representative at the closing expressly stated that "a portion of a gravel drive and parking area . . . encroaches onto a right of way owned by another." On the basis of this evidence, the court concluded that the Bradley siblings did not intend to convey a fee title.

On the basis of these subsidiary findings, the trial court concluded that the plaintiff had failed to establish that her predecessors in title had repudiated their permissive use. The court further concluded that, even if proof of repudiation were not required, the plaintiff had failed to establish her claim of adverse possession. The court therefore found in favor of the defendant on both the plaintiff's quiet title claim and the defendant's quiet title counterclaim. In addition, the court concluded that, because the plaintiff's notice of claim was filed more than forty years after the date that eleven out of the twelve deeds conveying the interests of Bond's heirs in the parcel to Marrion were filed, which deeds repre-

---

[18] The trial court noted that the deed's property description described the eastern border of the property as "running along the west line of a right of way 40 feet wide, south 3° 20' west 150 feet to a merestone; thence running south 72° 30' west to the southeast corner of north piece . . . ."

Dowling *v.* Heirs of Bond

sented seven-eighths of the heirs' interests, the notice had no effect under the MTA.

The trial court then turned to the defendant's slander of title counterclaim and concluded that the defendant established that the plaintiff had filed her notice of claim on the land records "with a reckless disregard for its truth and for the purpose of slandering the defendant's title to the fee." In support of this conclusion, the trial court relied on substantially the same evidence that it relied on to support its ruling on the plaintiff's quiet title claim, in addition to evidence concerning the dealings between the parties during the period preceding the plaintiff's filing of the notice of claim. The court determined that this evidence established that the plaintiff and Dowling Sr. were aware at the time they filed the notice that the defendant had record title to the parcel and that they knew or should have known that "there was no basis for the plaintiff's claim that her predecessors in title intended to convey any adverse possession claims to the fee of the parcel." The court also found it significant that Dowling Sr. had not provided Merriam with the title affidavit indicating that the parcel was owned by another or Grandjean's letter outlining the "stumbling blocks" to the plaintiff's adverse possession claim, and also had not discussed with Merriam the issue identified by Grandjean concerning the initial permissive entry onto the parcel by the plaintiff's predecessors in title. The court concluded that, because the plaintiff "did not make a full and fair disclosure to her attorneys," she was not entitled to raise an advice of counsel defense.[19]

After conducting an evidentiary hearing on damages, the trial court found that the defendant was entitled to

---

[19] The plaintiff filed a motion to reargue, contending that there was no evidence to support a finding that the plaintiff recklessly disregarded the truth or to support a finding imputing the reckless disregard of Dowling Sr. to her. The trial court denied the motion.

Dowling *v.* Heirs of Bond

damages for attorney's fees of $338,542.50 and costs of
the litigation in the amount of $44,876.33 pursuant to
§ 47-33j. Because the court found all of the claims in
the case to be inextricably intertwined, its award of
damages included legal fees and costs incurred by the
defendant in prosecuting its own claims, as well as
those incurred in defending the plaintiff's claims. The
court rendered judgment for the defendant on the plain-
tiff's quiet title claim and on the defendant's quiet title
and statutory slander of title claims, and awarded
$383,418.83in damages to the defendant. Additional
facts and procedural history will be set forth as nec-
essary.

This appeal followed. The plaintiff claims on appeal
that (1) the trial court applied an incorrect standard
when it required the plaintiff to establish that she had
repudiated her right by deed to use the parcel as a right
of way, (2) because the trial court's conclusion that the
plaintiff had failed to establish the elements of adverse
possession was inextricably intertwined with its incor-
rect application of the repudiation doctrine, that conclu-
sion was also incorrect, (3) the trial court incorrectly
determined that the plaintiff's predecessors in title did
not convey the parcel to her, (4) the trial court incor-
rectly determined that, for purposes of the MTA, the
eleven deeds from Bond's heirs to Marrion that were
recorded in the East Lyme land records in November,
1975, constituted root of title because the twelfth deed,
representing a one-eighth interest in the parcel, was
not filed until January, 1976, less than forty years before
the plaintiff filed her notice of claim, (5) the trial court
incorrectly determined that the defendant had estab-
lished its claim of statutory slander of title when the
defendant failed to plead and prove pecuniary damages,
(6) the trial court's determination that the plaintiff slan-
dered the defendant's title to the property and that she
was not entitled to an advice of counsel defense was

Dowling *v.* Heirs of Bond

erroneous, and (7) the trial court incorrectly determined that the defendant was entitled under § 47-33j to attorney's fees and costs incurred in defending the plaintiff's quiet title action.

With respect to the plaintiff's first claim, we agree with the plaintiff that the trial court improperly required her to establish that she had repudiated her right by deed to use the property as a right of way. We also conclude, however, that, contrary to the plaintiff's second claim, the trial court correctly determined that the plaintiff failed to establish her claim of adverse possession. Accordingly, we need not reach the plaintiff's third and fourth claims. With respect to the plaintiff's sixth claim, we agree with the plaintiff that the trial court incorrectly determined that the defendant had established its slander of title claim. We therefore need not reach the plaintiff's fifth and seventh claims.

I

The plaintiff first claims that the trial court applied an incorrect standard when it required her to establish, as a threshold matter, that, because she and her predecessors had a right of way to use the parcel, they had "repudiated" the defendant's permission to enter the parcel in order to prove adverse possession. Specifically, the plaintiff contends that she and her predecessors in title had no "permission" to pass over the parcel because she and her predecessors had a right by deed to pass over it, and permission to pass and a right to do so are not the same thing. The plaintiff further contends that, even if her right to pass over the parcel can be construed as permissive, she had permission only to use the parcel to pass and repass, not to possess and use the land as an owner. Because she claims that her predecessors in title used the parcel under a claim of right to ownership, she contends that they were not required to repudiate the permission to pass over the

Dowling *v.* Heirs of Bond

parcel. We agree with the plaintiff that the repudiation doctrine does not apply on the facts of this case, in which the right to use the land in a particular way was conferred by deed and in which the plaintiff contends that she used the land in a more extensive way that satisfies the standard requirements of adverse possession.

The general legal principles governing adverse possession are well settled.[20] When "title is claimed by adverse possession, the burden of proof is on the claimant. . . . The essential elements of adverse possession are that the owner shall be ousted from possession and kept out uninterruptedly for fifteen years under a claim of right by an open, visible and exclusive possession of the claimant without license or consent of the owner. . . . The use is not exclusive if the adverse user merely shares dominion over the property with other users. . . . Such a possession is not to be made out by inference, but by clear and positive proof. . . . In the final analysis, whether possession is adverse is a question of fact for the trier. . . . The doctrine of adverse possession is to be taken strictly." (Citations omitted; internal quotation marks omitted.) *Roche* v. *Fairfield*, 186 Conn. 490, 498–99, 442 A.2d 911 (1982); see *Rudder* v. *Mamanasco Lake Park Assn., Inc.*, 93 Conn. App. 759, 780, 890 A.2d 645 (2006) ("[adverse] possession is not to be made out by inference, but by clear and convincing proof" (internal quotation marks omitted)).

The inquiry is necessarily fact specific and context dependent. "In evaluating such claims, [t]he location and condition of the land [at issue] must be taken into consideration and the alleged acts of ownership must

---

[20] Whether the trial court applied the correct legal standard to the plaintiff's claim of adverse possession is a question of law subject to plenary review. See, e.g., *Boccanfuso* v. *Conner*, 89 Conn. App. 260, 282, 873 A.2d 208, cert. denied, 275 Conn. 905, 882 A.2d 668, and cert. denied, 275 Conn. 905, 882 A.2d 668 (2005).

Dowling *v.* Heirs of Bond

be understood as directed to those circumstances and conditions. . . . Additionally, in assessing whether hostility exists, the relation that the [alleged] adverse possessor occupies with reference to the owner is important.'' (Citations omitted; internal quotation marks omitted.) *Rudder* v. *Mamanasco Lake Park Assn.*, *Inc.*, supra, 93 Conn. App. 775. ''In sum, when determining whether the necessary elements of adverse possession exist, each claim must be decided on its own particular facts. The requirements vary according to, and it is necessary to consider, the nature and situation of the property. To determine whether particular acts constitute adverse possession, it is sometimes necessary to consider the character of the property and the purposes for which it is suitable, the circumstances attending the possession, the acts and declarations of [the] claimant while in possession, and the relation of the holder of the legal title to the claimant.'' (Internal quotation marks omitted.) Id., quoting 2 C.J.S. 459, Adverse Possession § 33 (2003); see 16 M. Wolf, Powell on Real Property (2019) § 91.03, pp. 91-14 through 91-15 (''whether possession may be characterized as actual depends on the nature and location of the property, the uses to which it can be applied, and all the facts and circumstances of a particular case'').

The role that the claimant's state of mind plays in the analysis, of particular importance in the present case, is also well established, although the doctrine is not without nuance.[21] On the one hand, it is typically said that the proper inquiry is conducted with reference to the actions and words of the party claiming ownership, not that party's unexpressed motives, knowledge or beliefs. This court has observed that ''the only legitimate inquiry in a case of adverse possession [is] whether

---

[21] We revisit and elaborate on this subject in part II of this opinion, which further examines the mental state required to establish adverse possession under Connecticut law.

Dowling *v.* Heirs of Bond

the party claiming ownership had the actual, open, adverse occupancy and possession of the controverted property, claiming it as [his] own . . . and actually excluding all other persons from its possession, for an uninterrupted period of fifteen years.'' (Internal quotation marks omitted.) *O'Connor* v. *Larocque*, 302 Conn. 562, 580–81, 31 A.3d 1 (2011). ''The possession alone, and the qualities immediately attached to it, are regarded. No intimation is there as to the *motive* of the possessor. If he intends a wrongful disseisin, his actual possession for fifteen years, gives him a title; or if he occupies what he believes to be his own, a similar possession gives him a title.'' (Emphasis in original.) *French* v. *Pearce*, 8 Conn. 439, 443 (1831); see *O'Connor* v. *Larocque*, supra, 595 n.23 (''[a] person's mistaken belief that he or she is the lawful owner is immaterial in an action seeking title by adverse possession''). Thus, a claim of adverse possession is equally valid whether the party making that claim used the property with the knowledge that it was owned by another or, instead, mistakenly believed that he owned the property.

That having been said, consideration of intent is by no means irrelevant to a claim of adverse possession because the claimant must establish that he or she possessed the land ''under a claim of right . . . .'' (Internal quotation marks omitted.) *Horowitz* v. *F. E. Spencer Co.*, 132 Conn. 373, 378, 44 A.2d 702 (1945). ''[This] means nothing more than [using the land] . . . without recognition of the right of the landowner, and that phraseology more accurately describes it than to say that it must be under a claim of right.'' (Internal quotation marks omitted.) *Phillips* v. *Bonadies*, 105 Conn. 722, 726, 136 A. 684 (1927). To establish that the claimant used the land under a claim of right, ''the intent of the possessor to use the property as his own must be shown. This issue involves an inquiry into his mental condition.'' *Horowitz* v. *F. E. Spencer Co.*, supra,

Dowling *v.* Heirs of Bond

378–79; see *O'Connor* v. *Larocque*, supra, 302 Conn. 581 ("[t]o establish title by adverse possession, the claimant must oust an owner of possession . . . under a claim of right with the intent to use the property as his own and without the consent of the owner" (internal quotation marks omitted)); *Top of the Town, LLC* v. *Somers Sportsmen's Assn., Inc.*, 69 Conn. App. 839, 842, 797 A.2d 18 (same), cert. denied, 261 Conn. 916, 806 A.2d 1058 (2002).

This brings us to the issue of permissive use, because prior permission may undermine the existence of a claim of right; use of the land by the express or "implied permission by the true owner is not adverse" and, therefore, cannot ripen into adverse possession. (Internal quotation marks omitted.) *Woodhouse* v. *McKee*, 90 Conn. App. 662, 675, 879 A.2d 486 (2005); see *Phillips* v. *Bonadies*, supra, 105 Conn. 725 ("[u]se by express or implied permission or license cannot ripen into an easement by prescription"). "[O]ne who enters into the possession of land in subordination to the title of the real owner . . . is estopped from denying that title while he holds actually *or presumptively* under it. . . . As with a prescriptive easement, implied permission by the true owner is not adverse." (Emphasis in original; internal quotation marks omitted.) *Woodhouse* v. *McKee*, supra, 674–75.

"[T]o establish the requisite notice of [his] hostile claim to the disputed area, the [claimant must] do something more than what was customary throughout the neighborhood and regarded as permissive . . . ." *Rudder* v. *Mamanasco Lake Park Assn., Inc.*, supra, 93 Conn. App. 777–78; see *Falvo* v. *Pejepscot Industrial Park, Inc.*, 691 A.2d 1240, 1243 (Me. 1997) (when evidence showed that "[the] plaintiffs used [the defendant company's] land in the same manner as other residents [in the company's development], that no residents were denied permission to use the land, and that [the] plain-

Dowling *v.* Heirs of Bond

tiffs complied with the mill owners' customary request that residents keep the mill property clean and neat,'' use was permissive, and plaintiffs failed to establish required element of hostility); 16 M. Wolf, supra, § 91.05 [5] [a], p. 91-36.1 (''a permissive use, which is consistent with a dedicator's intent, cannot simultaneously be detrimental to the dedicator's ownership rights'').

The doctrine of repudiation recognizes that ''[p]ossession that is permissive in its inception may become hostile. However, if the original entry is not hostile, it does not become so and the statute does not begin to run as against the rightful owner until the adverse claimant disavows the idea of holding for, or in subservienc[e] to, another and actually sets up an exclusive right in the adverse claimant. If the original entry on land is by permission of the owner or under some right or authority derived from the owner, the possession does not become hostile until the permission or authority has been clearly repudiated by the occupant. To change the character of the possession from permissive to hostile, the disavowal of the record owner's title and the assertion of an adverse claim must be shown by some clear, positive, and unequivocal act brought home to the owner, such as an explicit disclaimer. Otherwise, the possession will not be presumed to be hostile.'' (Internal quotation marks omitted.) *Woodhouse* v. *McKee*, supra, 90 Conn. App. 675; see 3 Am. Jur. 2d 132, Adverse Possession § 47 (2013) (''[i]f the original entry is not hostile, the possession does not become hostile until the adverse claimant disavows the idea of holding for, or in subservienc[e] to, the true owner and actually sets up an exclusive right in the adverse claimant''). ''There must be either actual notice of the hostile claim, or acts or declarations of hostility so manifest and notorious, or so open and notorious, that actual notice will be presumed, in order to change permissive possession to hostile or adverse possession.'' 3 Am. Jur. 2d, supra,

Dowling *v.* Heirs of Bond

§ 47, pp. 132–33. "For the purpose of changing permissive possession to hostile possession, mere possession or ordinary acts of ownership that are consistent with the permission are not enough to provide notice of the hostile claim. The evidence of adverse holding when the original entry is by permission must be very clear." (Footnote omitted.) Id., § 48, p. 133.

In the present case, the plaintiff contends that these principles of repudiation, which govern the use of land that was originally permissive, are inapplicable because she and her predecessors had an irrevocable right by deed to pass over the parcel. She contends that her right to use the parcel to pass and repass therefore was not permissive in the sense that would require her to demonstrate repudiation and, thus, that the trial court improperly required her to establish, by clear and convincing evidence, that she had clearly and explicitly repudiated her right to pass and repass in order to establish adverse possession.

We agree with the plaintiff and conclude that the repudiation doctrine does not apply under the circumstances of this case. Research has unearthed no cases or authorities that expressly distinguish permissive use from use pursuant to a right conferred by deed in their treatment of the repudiation doctrine. Our case law, however, has applied the principle that a clear and unequivocal repudiation of the landowner's permission to use the land for a particular purpose, such as to pass and repass, is required to establish adverse possession only in cases in which (1) the permission was in the form of a personal right or license, not a right conferred by deed, and (2) the claimant had used the land in the manner for which permission was granted. See *Vaicunas* v. *Gaylord*, 196 Conn. App. 785, 794, 230 A.3d 826 (2020); *Brander* v. *Stoddard*, 173 Conn. App. 730, 747, 164 A.3d 889, cert. denied, 327 Conn. 928, 171 A.3d 456 (2017); *Mulle* v. *McCauley*, 102 Conn. App. 803, 813–14,

Dowling *v.* Heirs of Bond

927 A.2d 921, cert. denied, 284 Conn. 907, 931 A.2d 265
(2007); *Rudder* v. *Mamanasco Lake Park Assn., Inc.*,
supra, 93 Conn. App. 783; *Top of the Town, LLC* v.
*Somers Sportsmen's Assn., Inc.*, supra, 69 Conn. App.
845. Although we have found no cases expressly holding
that repudiation is *not* required when the original per-
mission to use the land for a particular purpose was
granted by deed, the proposition stands to reason, and
the authorities suggest, that, when the right to use land
for a particular purpose was conferred by deed, and
the claimant has used the land for some *other* purpose
that is more extensive than the right conferred by deed,
the use may be considered hostile and give rise to a
claim of adverse possession. Cf. 2 Restatement (Third),
Property, Servitudes § 7.7, comment (c), p. 377 (2000)
("Adverse possession of the . . . servient estate does
not affect the servitudes burdening . . . the property
unless the adverse possessor *also* does something to
modify or terminate the servitudes. . . . Whether an
adverse possessor of a servient estate acquires title
free of the servitude burden depends on whether the
property has been used in a way that is adverse to the
persons entitled to enforce the servitude." (Emphasis
added.));[22] see also *Gemmell* v. *Lee*, 59 Conn. App. 572,

[22] In the present case, the plaintiff does not claim that her use of the
property terminated the servitudes on the parcel, namely, the rights of other
landowners at Old Black Point to pass and repass over it. Rather, she claims
an ownership interest in the parcel subject to those servitudes. Comment
(c) to § 7.7 of the Restatement (Third) of Property, Servitudes, presumes
that a person can obtain ownership by adverse possession of property that
remains subject to a servitude by engaging in acts that are inconsistent with
ownership by another but that are consistent with the existing servitude, as
the plaintiff claims in the present case. See 2 Restatement (Third), Property,
Servitudes § 7.7, comment (c), p. 377 (2000).

We note that there is some authority for the proposition that adverse
possession of the fee title of a property operates indirectly to extinguish
any easements in the property. See *Boccanfuso* v. *Conner*, 89 Conn. App.
260, 284, 873 A.2d 208 (referring to cases involving "a claim of adverse
possession seeking title to the fee of the land over which an easement
existed, which claim, if successful, could operate indirectly to extinguish
the easement" (emphasis omitted)), cert. denied, 275 Conn. 905, 882 A.2d

Dowling *v.* Heirs of Bond

578–79, 757 A.2d 1171 (rejecting defendants' claim that they had obtained "sole and exclusive rights" to road when their use of road was consistent with their easement over road by deed, and others had continuously used easement), cert. denied, 254 Conn. 951, 762 A.2d 901 (2000).

It makes sense to distinguish for these purposes between permissive use under a revocable personal right or license and use pursuant to a right by deed. A person who is entitled by deed to use land for a particular purpose has no reason, if that right is irrevocable and runs with the land, to claim adverse possession to establish ownership unless they wish to expand their use beyond the scope of the deeded entitlement. By contrast, a person whose permissive use is by personal right or license may wish to obtain ownership by adverse possession, even when they do not intend to expand their use of the land to unpermitted uses because, otherwise, the permission may be revocable and may not be transferable. This difference has consequences for the repudiation doctrine. When a claimant wishing to establish ownership by adverse possession has used the land permissively under a personal right or license, and has used the land *only for that purpose*, the only way that the landowner can be placed on notice of a claim of adverse possession is by a clear and unequivocal declaration that the claimant is using the land under

668, and cert. denied, 275 Conn. 905, 882 A.2d 668 (2005); id. ("[i]f there is adverse possession sufficient to divest a fee simple title to land, it will also operate to extinguish an easement in such land" (internal quotation marks omitted)), quoting 3 H. Tiffany, The Law of Real Property (3d Ed. 1939) § 827, p. 397. The defendant in the present case avoids making any express argument that a claimant's possession of a property that does *not* operate to extinguish an easement must necessarily also be insufficient to divest the owner of the fee title as a matter of law. As the circumstances of the present case show, however, it may be difficult, as a practical matter, for a claimant to establish the elements of adverse possession when the claimant fails to manifest any intention to prohibit use of land by its record owner or others who have a right to use it.

Dowling *v.* Heirs of Bond

a claim of right.[23] See 3 Am. Jur. 2d, supra, § 48, p. 133
("mere possession or ordinary acts of ownership *that
are consistent with the permission* are not enough to
prove *notice* of the hostile claim" (emphasis added)).
When a claimant has permission (whether by deed or
otherwise) to use the land for a particular purpose,
however, the mere use of the land for a purpose that
is *not* permitted and that is inconsistent with the true
owner's rights should be sufficient to put the landowner
on notice of a potential claim of adverse possession.
See id., § 47, pp. 132–33 ("acts . . . of hostility so mani-
fest and notorious, or so open and notorious, that actual
notice will be presumed . . . [are sufficient] to change
permissive possession to hostile or adverse posses-
sion"). For this reason, logic dictates that the repudia-
tion doctrine applies only when the person claiming
adverse possession had permission in the form a per-
sonal right or license to use the land for a particular
purpose and the claimant used the land only for that
purpose, because it is only in that situation that the
claimant's open use of the land would be insufficient to
put the record owner on notice of a hostile possession.

In the present case, the plaintiff is contending that
she and her predecessors in title used the parcel for
purposes for which they did not have permission, either
by license or by deed, and that their use in such a
manner was sufficiently open, hostile and notorious
to give notice to the defendant of a claim of adverse
possession. That is all that the law requires. To the
extent the trial court concluded that the plaintiff was
required to establish that her predecessors in title had

_____

[23] Obviously, if a person has an irrevocable right by deed to use land for
a particular purpose, such as to pass and repass over it, and the person
uses the land only for that purpose, the person would have no cause to
repudiate the right by deed in order to obtain the *same* right by prescription
or adverse possession. This point presumably explains why the cases
applying the repudiation doctrine involve personal permission or licenses
that can be revoked.

Dowling *v.* Heirs of Bond

clearly and unequivocally repudiated their right by deed to pass and repass over the parcel to establish a claim of adverse possession, that conclusion was incorrect.

II

We next address the plaintiff's claim that the trial court incorrectly determined that she failed to establish the elements of adverse possession. She makes two arguments in support of this claim. First, she contends that the trial court improperly required her to establish that she had the subjective intent to use the parcel as an owner to establish that she used the parcel under a claim of right.[24] Second, she contends that the court's conclusion that she failed to establish the elements of adverse possession was so intertwined with its incorrect determination that she was required to establish repudiation of her right by deed to use the property as a right of way that it cannot stand as an independent ground for affirmance. We disagree with both claims.

A

The plaintiff argues that she was not required to establish that she and her predecessors in title had the

---

[24] It is not entirely clear whether the plaintiff is claiming that the trial court incorrectly determined that, to establish the "claim of right" element of adverse possession, she had to show that she and her predecessors in title had the subjective intent to use the parcel as their own or, instead, she is claiming that the trial court concluded—properly, in the plaintiff's view—that she was required to show only that she and her predecessors engaged in acts that objectively evince such an intent, but incorrectly determined that the plaintiff had failed to meet her burden of proof. Our review of the record satisfies us that the trial court concluded that the plaintiff was required to establish that she had the subjective intent to use the parcel as her own. Specifically, the trial court concluded that, although it is irrelevant whether a claimant intended to take the land at issue from another or mistakenly believed that he owned the land, "courts are allowed to consider whether the prospective possessor *intended* to use the property as [his] own . . . ." (Emphasis in original.) We further note that the trial court denied the plaintiff's motion in limine, in which the plaintiff asserted that evidence of the subjective intent of the plaintiff and her predecessors to use the parcel as their own was irrelevant to the plaintiff's claim of adverse possession. Accordingly, we treat the plaintiff's claim as a claim that the court applied an incorrect standard.

Dowling *v.* Heirs of Bond

subjective intent to use the parcel as an owner, but only that they engaged in acts that objectively evinced such an intent. In support of this claim, the plaintiff relies on this court's statement in *French* v. *Pearce*, supra, 8 Conn. 443, "that it is the visible and adverse possession, with an intention to possess, that constitutes its adverse character, and not the remote views or belief of the possessor." The short answer to this argument is that any uncertainty arising from the language employed in *French* was eliminated by this court in *Horowitz* v. *F. E. Spencer Co.*, supra, 132 Conn. 373, in which we stated that, to the extent the court's decision in *French* and other earlier cases suggested that the subjective intent of the party claiming adverse possession to use the property as his own was not relevant to a claim of adverse possession, the cases had "been impliedly overruled." Id., 379. In no uncertain terms, *Horowitz* explains that cases since *French* had clarified that "the intent of the possessor to use the property as his own must be shown. This issue involves an inquiry into his mental condition." Id., 378–79; see id., 378 (" '[a]n essential element of the defendant's claim of title by adverse possession was that the use or occupation of the property be under a claim of right, and the intention of the person or persons using the property was material [on] the issue as to the character of such use' "), quoting *Mentz* v. *Greenwich*, 118 Conn. 137, 146, 171 A. 10 (1934); see also 3 Am. Jur. 2d, supra, § 42, p. 128 (In some jurisdictions, "[t]he claimant's intent to possess the disputed land, rather than the intent to take from the true owner, governs whether possession is hostile. In other words, hostile use or possession does not require an intention to dispossess the rightful owner, or even knowledge that there is one, but rather, there must be an intention to claim the property as one's own to the exclusion of all others. In such jurisdic-

Dowling *v.* Heirs of Bond

tions, no matter how hostile to the true owner the possession may be in appearance, it cannot be adverse unless it is accompanied by the intent on the part of the occupant to make it so.'' (Footnotes omitted.)).[25]

Indeed, *French* never held to the contrary. The discussion in that case of the required mental state to establish adverse possession does not question whether a claimant must intend to use the property as his own; such an intention is plainly required. See *French* v. *Pearce*, supra, 8 Conn. 443 (holding ''that it is the visible and adverse possession, *with an intention to possess*, that constitutes its adverse character'' (emphasis added)). The issue addressed in *French* focused on a related but fundamentally different question: must a claimant *intend to act wrongfully* when exercising possession over land, that is, must the acts establishing a claim of ownership be accompanied by knowledge that the claim is contrary to the rights of the actual owner? See id., 442–43. The court unequivocally answers ''no'' to this question, holding that the claimant's ''guilt or inno-

---

[25] Other jurisdictions arguably have concluded that subjective intent to use the property as one's own is not required or, indeed, is admissible to establish a claim of adverse possession and that adverse possession is shown exclusively by acts objectively evincing adverse use. See *Mavromoustakos* v. *Padussis*, 112 Md. App. 59, 71, 684 A.2d 51 (1996) (''adverse possession is to be determined by the objective manifestations of the adverse use, not by the subjective intent of the possessor'' (internal quotation marks omitted)), cert. denied, 344 Md. 718, 690 A.2d 524 (1997); *Totman* v. *Malloy*, 431 Mass. 143, 145, 725 N.E.2d 1045 (2000) (''[t]he guiding principle behind the elements of adverse possession is not to ascertain the intent or state of mind of the adverse claimant, but rather to provide notice to the true owner''); *Kellison* v. *McIsaac*, 131 N.H. 675, 679, 559 A.2d 834 (1989) (''trespassory use constitutes adverse use sufficient to satisfy the hostility requirement of adverse possession''). Even in these jurisdictions, however, it is unclear to us whether the claimant is still required to show his ''intent to use the property as one's own,'' just not the ''intent to dispossess the true owner of the property.'' In any event, it is clear that, under *Horowitz*, proof of the claimant's intent to use the property as his own is required to establish adverse possession in Connecticut. See *Horowitz* v. *F. E. Spencer Co.*, supra, 132 Conn. 378–79.

Dowling *v.* Heirs of Bond

cence'' is irrelevant. Id., 443. *French* holds that the required intention to possess is present, regardless of whether the possession is knowingly wrongful. See id. (''[i]f [the claimant] intends a wrongful disseisin, his actual possession for fifteen years, gives him a title; or if he occupies what he believes to be his own, a similar possession gives him a title''). The reasoning underlying this holding is equally clear: ''The very nature of the act is an assertion of [the claimant's] own title, and the denial of the title of all others. It matters not . . . that the possessor was mistaken, and had [the claimant] been better informed, would not have entered on the land. This bears on another subject—the moral nature of the action; but it does not point to the [i]nquiry of adverse possession.''[26] Id., 445.

[26] This holding, which has come to be known as the Connecticut rule; see R Helmholz, ''Adverse Possession and Subjective Intent,'' 61 Wash. U. L.Q. 331, 339 (1983); is in contrast to ''the older view (the Maine view) that, when a landowner occupies land beyond his true boundary line under the mistaken belief that in fact it lies within his boundary, his possession cannot be adverse and cannot ripen into title. Because the possessor is acting through ignorance or mistake, and would amend his occupation were the true boundary line known to him, his possession lacks the element of hostility necessary for adverse possession.'' Id.; see *Striefel* v. *Charles-Keyt-Leaman Partnership*, 733 A.2d 984, 992 n.9 (Me. 1999) (''Historically, two distinct lines of thought have emerged regarding the intent necessary to establish title by adverse possession in mistaken boundary cases. According to the minority or Maine rule . . . [o]ne who by mistake occupies . . . land not covered by his deed, with no intention to claim title beyond his actual boundary, wherever that may be, does not thereby acquire title by adverse possession to land beyond the true line. In contrast, the majority or Connecticut rule, based on *French* v. *Pearce*, [supra, 8 Conn. 439], recognizes adverse possession even when the occupancy began as a result of a mistaken, rather than intentional, trespass.'' (Citation omitted; internal quotation marks omitted.)). Although Professor Helmholz refers to ''the doctrine that pure possession is what matters for purposes of determining title''; R Helmholz, supra, 346; it appears that Helmholz intends the phrase ''pure possession'' to refer to use of the land without *intent to take land known to be owned by another.* Indeed, Helmholz rejects the view of some commentators that '' 'claim of right' '' means ''no more than physical occupation inconsistent with the rights of the true owner'' in favor of the view that, under the Connecticut rule, possession must be accompanied by an ''honest intent'' to use the land as one's own. Id., 343.

Dowling *v.* Heirs of Bond

In support of her claim that evidence of intent to use the property as one's own is not required, the plaintiff cites the statement of the Appellate Court in *98 Lords Highway, LLC* v. *One Hundred Lords Highway, LLC*, 138 Conn. App. 776, 54 A.3d 232 (2012), that "[t]he legal significance of the open and visible element [of adverse possession] is not . . . an inquiry as to whether a record owner subjectively possessed an understanding that a claimant was attempting to claim the owner's property as his own." (Internal quotation marks omitted.) Id., 809. That statement, however, addresses the "open and visible" element of a claim of adverse possession, which focuses on whether the use of the property was sufficiently visible and public that the *record title owner* was or should have been on notice of the use. The Appellate Court's observation in *98 Lords Highway, LLC*, does not speak to the showing necessary to establish that the claimant is in possession of the property under a claim of right, an inquiry that requires the party claiming adverse possession to establish his or her intention to use the property as its owner. The plaintiff also inaptly cites the Appellate Court's statements in *98 Lords Highway, LLC*, that "exclusive possession can be established by acts, which at the time, considering the state of the land, comport with ownership; [that is], such acts as would ordinarily be exercised by an owner in appropriating the land to his own use and the exclusion of others. . . . It is sufficient if the acts of ownership are of such a character as to openly and publicly indicate an assumed control or use such as is consistent with the character of the premises in question." (Internal quotation marks omitted.) Id., 810. These statements again simply describe the nature of the acts that can establish that the claimant's use was exclusive, open and visible. We recognize as a general principle that a party's intent often is proved by evi-

Dowling *v.* Heirs of Bond

dence of that person's actions,[27] and a party claiming adverse possession may seek to establish the requisite intent by reference to *acts* evidencing a claim of owner- ship, but this evidentiary point does nothing to remove the requirement to establish such intent.

The trial court correctly determined that the plaintiff was required to prove that she and her predecessors in title subjectively intended to use the property as their own to establish her claim of adverse possession.

B

We next address the plaintiff's claim that the trial court's determination that she failed to establish the elements of adverse possession was so intertwined with its incorrect conclusion that she was required to estab- lish that she had repudiated her right by deed to pass and repass over the parcel that it cannot stand as an independent ground for affirmance. The argument is without merit.

We find more than adequate evidence in the record to support each and every finding of the trial court undergirding its rejection of the plaintiff's various claims proffered to establish adverse possession. Many of these findings are recited earlier in this opinion and will not be repeated here, but the following points well illustrate that the court's conclusions rest on a solid evidentiary basis. With respect to Stephen and Anne Bradley's repair of the seawall in front of the parcel in the late 1990s, the trial court noted that the permit

---

[27] See, e.g., *State* v. *Campbell*, 328 Conn. 444, 546, 180 A.3d 882 (2018) ("[D]irect evidence of . . . state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.)); see also *Pimental* v. *River Junction Estates, LLC*, 207 Conn. App. 361, 370, 263 A.3d 847 (2021) ("the intention to dedicate the way to public use may be implied from the acts and conduct of the owner, and public acceptance may be shown by proof of the actual use of the way by the public" (internal quotation marks omitted)).

Dowling *v.* Heirs of Bond

application package that the Bradleys submitted to various government agencies contained "no assertion of [their] exclusive ownership of the parcel." Indeed, the Bradleys' engineer noted in his letter to the defendant, a copy of which was sent to the Bradleys, that the "most probable owner" of the parcel was either the town of East Lyme or the defendant, and he sought the defendant's "endorsement" of the project, which it provided. The trial court questioned why the Bradleys would have asked their neighbors to share the expense of the repairs to the seawall in front of the parcel if they were acting under a claim of ownership.

With respect to the septic system, the court found that the limited evidence presented by the plaintiff was insufficient to establish the circumstances of its installation but that it was suggestive of a permissive use. Moreover, as the court observed, because the septic system was underground, it was not a visible or notorious use of the parcel. It certainly cannot be said that the evidence regarding the septic system provides clear and convincing evidence of adverse possession.

The evidence pertaining to the planting of the evergreen trees adds no meaningful support to the plaintiff's claim. The trial court concluded that this particular evidence showed that Stephen Bradley and Anne Bradley, "by their words and conduct, recognized that title to the parcel was in another," i.e., that they had no intent to use the property as their own.[28] Specifically,

---

[28] As we indicated, a claimant who knows that another person has title to the property still may have the intent to use a property as his or her own. There may be circumstances, however, under which evidence of a claimant's knowledge that another person has title to the property can support an inference that the claimant did not intend to use the property as his or her own. In the present case, in light of Stephen Bradley's and Anne Bradley's involvement with the defendant and their knowledge of the defendant's concern with preserving the various rights of way, their knowledge that the parcel was owned by the defendant supports the inference that they did not intend to use it as their own.

Dowling *v.* Heirs of Bond

the court referred to the series of letters and board minutes showing that the Bradleys were aware that the defendant's position was that it would remove the trees if, at any time, they interfered with the right of way over the parcel, and that the Bradleys did nothing to disabuse the defendant of that belief. Indeed, the court noted that Scott Bradley and John Bradley testified that they and their parents always had understood that they did not own the parcel and that "anybody [could] use it," although Scott Bradley was surprised, at the time that they sold the property to the plaintiff, at how wide the parcel was. (Internal quotation marks omitted.)

With respect to the gravel parking area that encroached on the parcel, the trial court found that the Bradleys did not use the area on a daily basis, but only when they had large gatherings, and that the use of the area to park did not block the right of way. Accordingly, the court concluded that that use was not inconsistent with the defendant's ownership of the parcel. The court further found that the Bradley siblings had agreed to a reduction in the purchase price of $68,000 due, in part, to the need to reconfigure the parking area so that it would be located on the plaintiff's property, with the driveway located over the parcel. In addition, and significantly in our view, the court found that other owners of property abutting the rights of way leading to the shore used the rights of way in a similar manner.

Similarly, nothing in the record leads us to doubt the trial court's conclusions regarding the maintenance of the lawn by the plaintiff's predecessors in title and the installation of the birdbath. The court found that there was only limited evidence as to how the shorefront residents of Old Black Point had shared the expense for mowing their lawns, including the rights of way and the seventy-five foot reservation, and that there was no evidence that the Bradleys had acted any differently from the other property owners. The court concluded

Dowling *v.* Heirs of Bond

that this evidence did not constitute "clear and convincing evidence supporting [the plaintiff's] adverse possession claim," and we agree. The court also found that there was no evidence as to who had installed the birdbath or when it was installed and that, in any event, it was only thirty-six inches in diameter and not a substantial structure that could give rise to a claim of adverse possession of the entire parcel.

The foregoing findings formed the primary basis of the trial court's conclusion that the plaintiff had failed to establish adverse possession because her predecessors' use of the parcel was not hostile, open and notorious. Neither the court's factual findings nor its corresponding legal conclusion was affected in any respect by the court's erroneous application of the repudiation doctrine.

Additional findings of the trial court relating to still more distant historical events further undermined the plaintiff's claim of adverse possession. During the 1920s and 1930s, Bond's heirs, some of whom were active in the defendant's predecessor association, were concerned that the rights of way might be subject to claims of adverse possession. In a letter dated February 8, 1930, one of the heirs, Attorney Stephen Bond, wrote to all of the Old Black Point lot owners expressing his view that the rights of way should be kept open and stating that "[a] true reflection of community spirit and wishes helps in deciding how these passways shall be treated." Stephen Bond also referred to a merestone being hurled into the sea. In response, Arthur Francis, apparently an owner of property located at Old Black Point, indicated in a letter to Stephen Bond that the merestone had not been moved but merely "lower[ed]" by "Miss Bradley," or Mary Tremaine Bradley. The trial court concluded that the heirs of Norman J. Bond and the defendant's predecessor had expressed an intent in this correspondence "to maintain [the rights of way]

Dowling *v.* Heirs of Bond

for the benefit of the community of owners of lots in the development . . . . They also strove to be neighborly in the maintenance of their control and ownership of the rights of way.''

The trial court found that the plaintiff had presented no evidence that Mary Tremaine Bradley ''acted in a way inconsistent with her easement over the parcel'' and that her conduct with respect to the parcel ''was similar to the conduct of other shorefront lot owners in the neighborhood'' with respect to the rights of way abutting their properties. In other words, because Mary Tremaine Bradley's activities on the parcel, such as the reconstruction of the seawall and lawn after the 1938 hurricane, which was paid for by her and her neighbor, were consistent with the prevailing ''community spirit'' at Old Black Point and the actions of other property owners abutting the various rights of way, the activities did not evince an intent to use the property as her own. See 3 Am. Jur. 2d, supra, § 41, p. 127 (''[when] there is a close and cooperative relationship between the record owner and the person claiming title through adverse possession, a presumption of hostility may not apply''); see also *Rudder* v. *Mamanasco Lake Park Assn.*, *Inc.*, supra, 93 Conn. App. 777–78 (''to establish the requisite notice of their hostile claim to the disputed area, the [claimants must] do something more than what was customary throughout the neighborhood and regarded as permissive use'').

These findings, regarding the words and conduct of Stephen Bradley and Mary Tremaine Bradley almost one century ago, indicate either that the plaintiff's right by deed to pass and repass over the parcel included the implied right to maintain the parcel in various ways for the benefit of all of the property owners entitled to use the right of way, or that the plaintiff's predecessors in title had an implied license to use the parcel in a manner that was customary in the neighborhood and

regarded as permissive. In neither event could the trial court's legal error regarding the repudiation doctrine have impacted the necessary conclusion that the plaintiff had failed to establish adverse possession.[29]

On the basis of the foregoing, we reject the plaintiff's claim that the trial court's conclusion that she failed to establish adverse possession of the parcel by clear and convincing evidence cannot stand as a ground for the court's decision, independent of the court's incorrect determination that the plaintiff was required to establish that she and her predecessors in title had repudiated their right by deed to pass and repass over the parcel. The court plainly, and reasonably, found with respect to each of the plaintiff's claims that she had not established all of the elements of adverse possession, specifically, she failed to establish that she and her predecessors in title had "actual, open, adverse occupancy and possession of the controverted property, claiming it as [their] own . . . and actually excluding all other persons from its possession, for an uninterrupted period of fifteen years." (Internal quotation marks omitted.) *O'Connor* v. *Larocque*, supra, 302 Conn. 580–81.

III

The plaintiff claims that the trial court incorrectly determined that she slandered the defendant's title to the parcel under § 47-33j when she filed the notice of her claim of adverse possession of the parcel on the land records. We conclude that the defendant failed to establish its claim of slander of title as a matter of law.

The clearly erroneous standard applies to our review of the factual findings underlying the determination that

---

[29] In other words, although the plaintiff was not required to establish that her predecessors in title had repudiated their right by deed to pass and repass over the parcel in order to establish adverse possession, she was required to establish that any more extensive use of the parcel was not impliedly permitted, which she failed to do.

Dowling *v.* Heirs of Bond

a defendant has committed slander of title under § 47-
33j by making a defamatory statement with knowledge
of its falsity or in reckless disregard of the truth. See
*Fountain Pointe, LLC* v. *Calpitano*, 144 Conn. App.
624, 655, 76 A.3d 636 ("[w]hether a defendant has knowl-
edge of the falsity of a defamatory statement is a ques-
tion within the province of the trier of fact" (internal
quotation marks omitted)), cert. denied, 310 Conn. 928,
78 A.3d 147 (2013); see also id., 636 (when factual basis
of court's decision is challenged, court must determine
whether facts are clearly erroneous). When the underly-
ing facts are undisputed, however, whether those facts
satisfy the applicable legal standard is a question of
law subject to plenary review. Cf. *Burns* v. *Adler*, 325
Conn. 14, 33, 155 A.3d 1223 (2017) (although question
of whether party acted in bad faith is question of fact
subject to review for clear error, "whether undisputed
facts meet the legal standard of bad faith is a question
of law" subject to plenary review). Whether a legal
position taken by a party accused of slander of title is
reasonable also presents a question of law. Cf. *Morris*
v. *Paul Revere Life Ins. Co.*, 109 Cal. App. 4th 966, 973,
135 Cal. Rptr. 2d 718 (2003) (when issue of whether
insurer acted in bad faith depends on reasonableness
of insurer's legal position, issue presents "a pure ques-
tion of law" subject to de novo review).

General Statutes § 47-33j provides: "No person may
use the privilege of recording notices under sections
47-33f and 47-33g for the purpose of slandering the title
to land. In any action brought for the purpose of quieting
title to land, if the court finds that any person has
recorded a claim for that purpose only, the court shall
award the plaintiff all the costs of the action, including
such attorneys' fees as the court may allow to the plain-
tiff, and in addition, shall decree that the defendant
asserting the claim shall pay to the plaintiff all damages

Dowling *v.* Heirs of Bond

the plaintiff may have sustained as the result of such notice of claim having been so recorded.''

The elements of the statutory claim are informed by its common-law origin. See *Fountain Pointe*, *LLC* v. *Calpitano*, supra, 144 Conn. App. 655 (''[a]s there is little appellate case law regarding the actual malice element of a [statutory] slander of title claim, we turn to the precedents of common-law slander to guide our analysis''). ''To establish a case of slander of title, a party must prove the uttering or publication of a false statement derogatory to the plaintiff's title, with malice, causing special damages as a result of diminished value of the plaintiff's property in the eyes of third parties. The publication must be false, and the plaintiff must have an estate or interest in the property slandered.'' (Internal quotation marks omitted.) Id., 652; see 3 Restatement (Second), Torts § 624, pp. 342–43 (1977) (rules on liability for publication of injurious false statements in § 623A of Restatement (Second) of Torts apply to publication of false statement disparaging another's property rights in land); 3 Restatement (Second), Torts, supra, § 623A (b), p. 334 (''[o]ne who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if . . . he knows that the statement is false or acts in reckless disregard of its truth or falsity'');[30] see also 50 Am. Jur. 2d 925, Libel and Slander § 523 (2017) (''[m]alice in the making of a slanderous statement regarding the ownership of property is an essential element of a claim for slander of title'').

Actual malice has a particular meaning in this context. ''The proper inquiry is whether a defendant believes,

---

[30] As the following discussion makes clear, the type of malice necessary to establish slander of title requires a showing that the defendant either knew that the statement was false or published the statement with reckless disregard of the truth. Rather than use the term ''malice'' to define the required elements, the Restatement (Second) of Torts uses this alternative formulation, but the required showing is the same.

Dowling *v.* Heirs of Bond

honestly and in good faith, in the truth of his statements and whether he has grounds for such belief.'' *Gambardella* v. *Apple Health Care, Inc.*, 291 Conn. 620, 638, 969 A.2d 736 (2009). ''[A]ctual malice requires a showing that a statement was made with knowledge that it was false or with reckless disregard for its truth. . . . A negligent misstatement of fact will not suffice; the evidence must demonstrate a purposeful avoidance of the truth. . . . Further, proof that a defamatory falsehood has been uttered with bad or corrupt motive or with an intent to inflict harm will not be sufficient to support a finding of actual malice . . . although such evidence may assist in drawing an inference of knowledge or reckless disregard of falsity.'' (Citations omitted; internal quotation marks omitted.) Id., 637–38. Acting with ''reckless disregard'' of the truth in this context means recording a notice ''despite [having] a high degree of awareness of probable falsity or entertaining doubts as to its truth.'' 50 Am. Jur. 2d, supra, § 523, pp. 925–26.

''Malice is not present, for purposes of an action for slander of title, [when] the allegedly slanderous statement regarding the title of property, although false, was made in good faith and with probable cause for believing it or with a reasonable belief in its veracity. . . . The malice necessary for a slander of title action also does not exist when the offending party's actions rest on a rational, yet incorrect, interpretation of law.'' (Footnotes omitted.) Id., § 523, pp. 927–28; see *Hicks* v. *Early*, 235 Ark. 251, 254, 357 S.W.2d 647 (1962) (''Malice may not be inferred from a mistake of law honestly made. . . . The evidence of malice must support the reasonable inference that the representation not only was without legal justification or excuse, but was not innocently made.'' (Internal quotation marks omitted.)); *Whildin* v. *Kovacs*, 82 Ill. App. 3d 1015, 1016, 403 N.E.2d 694 (1980) (''if the [claimant] . . . has reasonable grounds to believe that he has title or a claim to the

Dowling *v.* Heirs of Bond

property, he has not acted with malice''); *Anton, Sowerby & Associates, Inc.* v. *Mr. C's Lake Orion, LLC,* 309 Mich. App. 535, 549, 872 N.W.2d 699 (2015) (''slander of title is not established when premised on a rational interpretation of law'').

In the present case, the trial court concluded that the claim of adverse possession that the plaintiff made in the notice of claim that she recorded on the East Lyme land records was made with a reckless disregard for its truth. In support of this conclusion, the court found, most significantly, that the title affidavit that the Bradley siblings' representative presented at the closing showed that the plaintiff was aware that the Bradley siblings knew that they did not have title to the parcel and, therefore, must have known that their ''use of the parcel was not with the intent to use [it] exclusively as their own.'' The court also observed that Grandjean, one of the lawyers consulted by Dowling Sr. had informed his client (whose knowledge the court imputed to the plaintiff) that Anne Bradley participated in the defendant's board meetings in the mid-1970s during the period when Marrion, the defendant's attorney, acquired the interests of the Bond heirs in the rights of way and then conveyed those interests to the defendant. In addition, the court observed that Dowling Sr. ''ignored the import of a permissive user seeking to adversely possess the fee of the easement'' after Grandjean expressed his concerns about the fact that the Bradley family had had a deeded right to pass and repass over the parcel. Finally, the court observed that Grandjean indicated to Dowling Sr. that Marrion had done ''a workmanlike job'' in identifying the heirs of Norman J. Bond and having their interests in the parcel transferred to the defendant in the 1970s.[31] (Internal quotation marks

[31] The trial court further observed the following additional facts in support of its conclusion that the plaintiff acted with reckless disregard for the truth: the deed to the property indicated that it was bounded to the east by a ''right of way 40 feet wide'' and granted the plaintiff an easement over the parcel; the Bradley siblings had reduced the sale price of the property by

Dowling *v.* Heirs of Bond

omitted.) The trial court concluded that the plaintiff's awareness of the facts that her predecessors in title knew that the defendant had record title to the parcel[32] and never intended to use the parcel as their own established that the plaintiff's claim of adverse possession was knowingly false.

We do not take these factual findings lightly; nor do we brush aside their legal significance without due consideration. The evidence, as developed at trial, established that the plaintiff had a weak, even unwinnable, claim of adverse possession. Some of that evidence was known to the plaintiff or her husband before the plaintiff filed the notice of her claim of adverse possession on the land records, and most of the relevant facts could or should have been known prior to that time. The sticking point here, however, is that the plaintiff's claim of adverse possession was premised on an incorrect *legal* theory, namely, the proposition that a claimant's lack of subjective intent to use the property as

$68,000 in lieu of resolving "certain issues relating to the location of the driveway on the property, and the condition of the seawall"; (internal quotation marks omitted); and Dowling Jr. was aware before the sale of the defendant's position that it had title to the parcel. The court also reiterated its findings rejecting the plaintiff's claims that the specific uses of the parcel by the plaintiff's predecessors in title established adverse possession.

[32] The fact that a claimant knew that he or she did not have record title to the land at issue, standing alone, is not fatal to a claim of adverse possession. See *French* v. *Pearce*, supra, 8 Conn. 443 ("[i]f [the claimant] intends a wrongful disseisin, his actual possession for fifteen years, gives him a title"); *Eberhardt* v. *Imperial Construction Services, LLC*, 101 Conn. App. 762, 768, 923 A.2d 785 ("[a] claim of right does not necessarily mean that the adverse possessor claims that it is the proper titleholder, but that it has the intent to disregard the true owner's right to possession" (internal quotation marks omitted)), cert. denied, 284 Conn. 904, 931 A.2d 263 (2007). As we explained in part II of this opinion, for purposes of establishing a claim of right, the claimant's subjective intent to use the land as his or her own is dispositive. We agree with the trial court, however, to the extent that it concluded that a claimant's knowledge that he or she did not have title to the land may, in appropriate circumstances, support a finding that the claimant did not intend to use the land as his or her own.

Dowling *v.* Heirs of Bond

his or her own is not fatal to a claim of adverse posses-
sion—and that legal theory was endorsed, and perhaps
even generated, by her attorneys. On the basis of advice
from her attorneys, including Merriam, the plaintiff
believed that she could establish adverse possession
by showing that she and her predecessors in title used
the property in a manner that objectively evinced own-
ership, regardless of their subjective beliefs regarding
actual ownership. In other words, the plaintiff's claim
was based on the mistaken premise that a person may
adversely possess land *by accident*.

The source of this error is clear from Merriam's letter
to Dowling Sr., outlining the reasoning that would sup-
port the plaintiff's claim of adverse possession. This
document was written "as a forceful statement" advo-
cating the plaintiff's "best case," not as a neutral opinion
letter, but it plainly was not intended to misrepresent
the facts or the law; to the contrary, it purported to
adhere to the facts, as known to the author, and, more
important for present purposes, the letter contained
extensive legal citations in support of various legal
propositions that plainly were intended to present the
client with a true and accurate portrayal of Connecticut
law governing adverse possession. In particular, the
letter demonstrates without any doubt that the author
was aware that the Bradleys disavowed any claim of
ownership of the parcel.

After reviewing the facts that had been made known
to him, Merriam discussed the law of adverse posses-
sion and its component elements, and then applied each
aspect of the law to the facts to reach a conclusion
arguing that each respective element of adverse posses-
sion was established in this case. The letter did not
stop there. Merriam proceeded to address two of the
arguments against adverse possession that had been
raised by the defendant by that point in time, one of
which was the claim that the Bradleys never claimed

Dowling *v.* Heirs of Bond

ownership of the parcel. This portion of the letter appears under a separate heading entitled "*Anne Bradley's alleged opinion regarding the* [*p*]*arcel does not affect your adverse possession.*" (Emphasis in original.) Merriam provides the following advice in this part of the letter: "Determining adverse possession is an objective test based on the adverse possessor's actions, not his or her subjective personal opinions. Thus . . . the nature of the possession is the sole inquiry, not the possessor's subjective intent, since a claimant may acquire title by adverse possession 'even though the possessor knows that he is wholly occupying without right; all that is necessary to prove is that there was a user as of right, that is, one in disregard of any rights of the holder of the legal title.' [*Ruick* v. *Twarkins*, 171 Conn. 149, 158, 367 A.2d 1380 (1976).] In 2007 . . . Morris, counsel for [the defendant], asserted that Anne Bradley, a prior owner of the [p]roperty, was an active member of [the defendant] and, as such, apparently understood the importance of 'exterior [rights of way]' to the [defendant], and that, ostensibly, this knowledge prevented her from adversely possessing the [p]arcel. Similarly . . . Groark, [p]resident of [the defendant], asserted in a letter that Scott Bradley stated that his family did not believe they owned the [p]arcel but had built the seawall on that portion to protect the [p]roperty and mowed the [p]arcel 'but not under a claim of ownership.' These statements may be hearsay. Even if . . . Groark's hearsay report of the subjective opinions of the Bradleys is accurate, those opinions are not probative because the [Bradley siblings'] *actions*, and the actions of other predecessors in title in using and dominating the [p]arcel, especially in leveling, backfilling, and maintaining a unified lawn, objectively demonstrate the intent to use the [p]arcel as their own, thereby establishing adverse possession." (Emphasis in original.)

Two things are clear from this evidence. First, the plaintiff's lawyer knew, at the time he drafted his letter,

Dowling *v.* Heirs of Bond

that there was significant evidence in the defendant's possession indicating that the Bradley family had not used the parcel under a claim of ownership. Merriam may not have known the *extent* of that evidence because it appears that Dowling Sr. had not provided him with the affidavit of title from the closing, but the specific issue clearly had been brought to his attention, and it was directly addressed by him in a portion of the letter explicitly devoted to that very issue. Second, regardless of the volume of evidence regarding the states of mind of the Bradleys with respect to ownership, Merriam considered that evidence legally irrelevant. He advised his clients in no uncertain terms that the various family members' "subjective opinions" about the ownership of the land and the nature of their own use of it were "not probative because the [Bradley siblings'] *actions*, and the actions of other predecessors in title in using and dominating the [p]arcel . . . objectively demonstrate the intent to use the [p]arcel as their own, thereby establishing adverse possession."[33] (Emphasis in original.)

As we previously explained in our discussion of the relevant legal principles, Merriam (and the plaintiff's other lawyers) were and remain incorrect on this legal point. A claimant may adversely possess land through *mistake*, i.e., with the mistaken belief that the claimant

---

[33] In addition, as we indicated; see footnote 24 of this opinion; the plaintiff's attorneys—Wesley W. Horton and Brendon P. Levesque of Horton, Dowd, Bartschi & Levesque, P.C., and Louis B. Blumenfeld of Cooney, Scully and Dowling—filed a motion in limine before trial, in which they asked the trial court to exclude all evidence of anyone's subjective intention with respect to the use and ownership of the parcel on the ground that such intent is irrelevant for purposes of establishing the elements of adverse possession under *French* v. *Pearce*, supra, 8 Conn. 439. Moreover, the plaintiff's trial attorneys, Blumenfeld and Lorinda S. Coon of Cooney, Scully and Dowling, argued in their posttrial brief to the trial court that the rule in Connecticut "is an objective test of adverse possession based simply on occupancy without consent." Thus, two respected law firms evidently labored under the same misapprehension regarding Connecticut law on this particular point.

Dowling *v.* Heirs of Bond

owned the land at issue, but Connecticut cases also make it clear that a subjective *intent to use the land as one's own*—i.e., under a claim of right—is an essential element of adverse possession.[34] The fact that we have concluded that this legal position is *wrong*, however, does not mean that the position was so irrational that no reasonable attorney could propound it. See 50 Am. Jur. 2d, supra, § 523, p. 928 ("[t]he malice necessary for a slander of title action . . . does not exist when the offending party's actions rest on a rational, yet incorrect, interpretation of law"). In support of their position, the plaintiff's attorneys relied on this court's statement in *French* v. *Pearce*, supra, 8 Conn. 443, "that it is the visible and adverse possession, with an intention to possess, that constitutes its adverse character, and not the remote views or belief of the possessor." Although this court expressly disavowed the plaintiff's reading of *French* in *Horowitz*—while tacitly recognizing that that reading was not entirely unreasonable—neither the defendant nor the trial court cited *Horowitz*; rather, they relied only on subsequent case law that is *implicitly* inconsistent with *French*. We further note that a number of other jurisdictions appear to have adopted the rule urged by the plaintiff. See footnote 25 of this opinion. We conclude, therefore, that, although the plaintiff's claim of adverse possession was, in our view, quite weak, both factually and legally, the claim was at least colorable in light of her mistaken but not entirely unreasonable position that she was not required to establish that her predecessors in title had any subjective intent to use the land as their own to establish the "under a claim of right" element of the claim.[35] Because the

_____

[34] See part II A of this opinion; see also *Horowitz* v. *F. E. Spencer Co.*, supra, 132 Conn. 377.

[35] Having concluded that the malice necessary to establish slander of title did not exist because the plaintiff's attorneys' belief that a subjective intent to use the property as one's own is not an element of adverse possession was not irrational, albeit incorrect, we need not consider whether the trial court properly rejected the plaintiff's advice of counsel defense on the ground that the plaintiff failed to disclose all relevant facts to her attorneys,

Dowling *v.* Heirs of Bond

plaintiff's awareness that her predecessors in title knew that they did not own the parcel and had no intent to use it as their own[36] was not inconsistent with her legal theory, and because her legal theory, although wrong, was not entirely unreasonable, we conclude that, as a matter of law, the trial court incorrectly determined that the plaintiff had acted with actual malice when she filed the notice of her claim of adverse possession of the parcel pursuant to § 47-33f.

including the $68,000 reduction in the purchase price related to the exclusion of the parcel, the title affidavit indicating that the property's parking area and driveway encroached on the parcel and Grandjean's "stumbling blocks" letter. See *Verspyck* v. *Franco*, 274 Conn. 105, 112, 874 A.2d 249 (2005) ("full and fair disclosure of material facts [is] required by the advice of counsel defense"). In other words, even if we were to attribute her attorneys' states of mind to the plaintiff, they were not acting with the requisite malice. As we suggested, however, all of the withheld information went to the plaintiff's knowledge that (1) the Bradley siblings knew that they did not own the parcel, and (2) none of her predecessors in title had intended to use the parcel as their own. Because the plaintiff's attorneys believed that she could establish adverse possession, even in the absence of such intent, the withheld information was not material. See id., 114 (defendant was not entitled to advice of counsel defense when "the fact finder reasonably could have concluded that [the] omitted facts were material").

[36] We assume for purposes of this opinion that the trial court properly found that the plaintiff was aware before recording her notice of claim that her predecessors in title had no intent to use the parcel as their own. We note, however, that "[a]dverse possession claims are highly fact and context specific." *Rudder* v. *Mamanasco Lake Park Assn.*, *Inc.*, supra, 93 Conn. App. 775. Although the plaintiff clearly was aware of some of the evidence supporting the conclusion that the Bradleys had no intent to use the property as their own before she filed the notice, she would not necessarily have known that that evidence would not be undermined or controverted by other evidence. For example, although the plaintiff was aware of certain evidence that the Bradley siblings, Stephen Bradley, and Anne Bradley knew that they did not have title to the parcel, there was other evidence that, at least conceivably, and without preknowledge of all of the evidence that would be presented at trial, could support a finding that the Bradleys subjectively intended to use the parcel as their own. This evidence includes Scott Bradley's letter to the defendant indicating that, as the result of his family's use of the parking area encroaching on the parcel, the doctrine of adverse possession might present legal issues "not favorable to the approach [that the defendant] is currently pursuing." Thus, even if the plaintiff had applied

Dowling *v.* Heirs of Bond

Moreover, although evidence of a bad or corrupt motive or an intent to inflict harm is not required to establish a slander of title claim, lack of such a motive or intent may be probative. See *Fountain Pointe, LLC* v. *Calpitano*, supra, 144 Conn. App. 655–56 ("proof that a defamatory falsehood has been uttered with [a] bad or corrupt motive or with an intent to inflict harm will not be sufficient to support a finding of actual malice . . . although such evidence may assist in drawing an inference of knowledge or reckless disregard of falsity" (internal quotation marks omitted)). It is difficult in the present case to perceive what the plaintiff would have had to gain by recording a notice of a knowingly false claim of adverse possession on the land records. The trial court found that the plaintiff was "determined to acquire fee to the parcel by negotiation or litigation," but the recording of the notice of claim would have placed little, if any, pressure on the defendant to negotiate or settle the issue of ownership in favor of the plaintiff because there is no evidence that the recording of the notice interfered with the defendant's right to use the parcel or with any plans to transfer title to it. There is also no evidence that the notice interfered in any way with the rights of neighboring landowners to pass and repass over the parcel. As far as the evidence shows, the plaintiff's sole motive in recording the notice was to prevent her claim of adverse possession from being extinguished by operation of the MTA. We conclude, therefore, that the trial court incorrectly determined that the defendant established its counterclaim for slander of title under § 47-33j.[37]

the proper legal standard, it is not entirely clear to us that her claim of adverse possession would have been in reckless disregard of the truth.

[37] Because the defendant cannot prevail on its counterclaim for slander of title under § 47-33j, it was not entitled to attorney's fees and costs pursuant to that statute. We therefore need not address the plaintiff's claim that the trial court improperly included attorney's fees and costs for defending the plaintiff's quiet title action.

174        OCTOBER, 2022        345 Conn. 119

Dowling *v.* Heirs of Bond

The judgment is reversed insofar as the trial court found in favor of the defendant on its counterclaim for slander of title, the case is remanded with direction to render judgment for the plaintiff on that claim, and the award of attorney's fees and costs is vacated; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.